# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v ARNOLD

Docket No. 160046. Argued March 3, 2021 (Calendar No. 1). Decided July 28, 2021.

Lonnie J. Arnold was convicted following a jury trial of aggravated indecent exposure, MCL 750.335a(2)(b), and indecent exposure by a sexually delinquent person, MCL 750.335a(2)(c). He was sentenced by the Monroe Circuit Court, Michael A. Weipert, J., as a fourth-offense habitual offender to 25 to 70 years in prison for indecent exposure by a sexually delinquent person; his sentence for aggravated indecent exposure was later set aside. At sentencing, Arnold argued that MCL 750.335a(2)(c) required a sentence of "1 day to life" as provided in the statute, but the trial court stated that it was prohibited from imposing a sentence with a minimum penalty of a term of years and a maximum penalty of life. The court's minimum sentence of 25 years was calculated to fit within the sentencing guidelines range. Arnold appealed his sentence. The case eventually made its way to the Supreme Court, which held that the "1 day to life" sentence for indecent exposure as a sexually delinquent person in MCL 750.335a(2)(c) was an alternative to the other sentences provided in MCL 750.335a and was not modifiable. *People v Arnold*, 502 Mich 438 (2018) (*Arnold I*). The Supreme Court remanded the case to the Court of Appeals to resolve the effect of the sentencing guidelines on the sentencing scheme for sexually delinquent persons in MCL 750.335a(2)(c). On remand, the Court of Appeals, GLEICHER, P.J., MURRAY, C.J., and CAVANAGH, J., concluded that the sentencing guidelines provide another sentencing alternative for persons convicted of indecent exposure as sexual delinquents. Accordingly, a sentencing court can sentence such defendants to either "1 day to life" or to a sentence premised on the guidelines. Because the trial court was not aware of this range of sentencing options, the Court of Appeals vacated Arnold's sentence and remanded to the trial court for resentencing. 328 Mich App 592 (2019). Arnold sought leave to appeal in the Supreme Court, and the Court granted his application for leave to appeal. 505 Mich 1001 (2020).

In an opinion by Justice VIVIANO, joined by Justices ZAHRA, BERNSTEIN, and WELCH, the Supreme Court *held*:

MCL 750.335a prohibits indecent exposure and aggravated indecent exposure, establishes penalties for those offenses, and establishes an alternative sentence that is available when a defendant commits one of those offenses while being a sexually delinquent person. In *Arnold I*, the Supreme Court interpreted the statute to allow a defendant convicted of an indecent-exposure offense as a sexually delinquent person to be sentenced to either a nonmodifiable sentence of "1

day to life" under MCL 750.335a(2)(c) or to the appropriate penalty in MCL 750.335a(2)(a) or (b). Under MCL 777.16q of the sentencing guidelines, MCL 750.335a(2)(c) is a Class A felony punishable by a statutory maximum sentence of life imprisonment. The guidelines grid for Class A felonies at MCL 777.62 lays out a range of possible minimum sentences for term-of-years sentences, depending on how the guidelines are scored, in contrast to the "1 day to life" sentence in MCL 750.335a(2)(c). MCL 777.16q and MCL 777.62 thus appear to allow for sentences that clash with the "1 day to life" sentence in MCL 750.335a(2)(c). This apparent conflict required a determination of whether the guidelines create a substantive-penalty provision for MCL 750.335a(2)(c) that authorizes the courts to impose that penalty to the exclusion of the penalty in MCL 750.335a(2)(c). The guidelines do not purport to trump the substantive penalties in the statutes that establish the criminal offense; rather, in MCL 769.34(2)(a), the Legislature has subordinated the guidelines to the applicable penalty provisions in the substantive criminal statutes. Accordingly, because MCL 750.335a(2)(c) establishes a mandatory minimum sentence of one day and makes no allowance for variances, the court must impose the sentence in MCL 750.335a(2)(c) or the applicable alternative in MCL 750.335a(2)(a) or (b). The only possible textual basis for a term-of-years sentence for MCL 750.335a(2)(c) is a reference in MCL 777.16q to "Life" as the statutory maximum sentence for that offense. But nothing in the text indicates that the term "Life" can encompass any term of years, such as the 70-year maximum sentence imposed by the trial court in this case. Interpreting "life" to mean "life or any term of years" would cut against the meaning of life imprisonment as well as caselaw treating life sentences and term-of-years sentences as mutually exclusive. Further, while "life" might be the only possible maximum sentence, it is hard to see how MCL 777.16q imposes this sentence. Such an interpretation would require a determination that the statute implicitly referred to in MCL 777.16q in the "Stat Max" (statutory maximum sentence) column is MCL 777.16q itself, rather than the substantive criminal statute. This conclusion is belied by the fact that all of the other offenses in the relevant sentencing grids in the guidelines indicate that the statute referred to in the "Stat Max" column is the relevant Penal Code statute listed in the grid. Thus, the most natural reading of MCL 777.16q confirms that MCL 750.335a(2)(c) establishes the substantive penalty for indecent exposure as a sexually delinquent person. Further, the guidelines are part of the Code of Criminal Procedure, MCL 760.1 *et seq*. The term "procedure" is usually used in contradistinction to "substantive"; the substantive criminal law generally encompasses the definitions of crimes and the penalties for the crimes. "Procedure," by contrast, is the law governing the series of procedures through which the substantive criminal law is enforced. The titles of the Penal Code, MCL 750.1 *et seq.*, and the Code of Criminal Procedure support these observations. The Penal Code's title states that the act's purpose is "to define crimes and prescribe the penalties therefor . . . ," while the title of the Code of Criminal Procedure provides that its purpose is to "codify the laws relating to criminal procedure." The contents of the Code bear this out, as none of its provisions involves the direct creation of crimes or the imposition of core penalties. Therefore, neither MCL 777.16q or MCL 777.62 mandates a particular sentence or range of sentences, nor do they establish discrete penalties or supplant the penalties specified in the substantive criminal statute. For these reasons, MCL 777.16q and MCL 777.62 cannot be read to authorize sentence ranges that are an alternative to the penalty in MCL 750.335a(2)(c). Therefore, the reference in MCL 777.16q to MCL 750.335a(2)(c) is nugatory, and MCL 777.62 does not apply to individuals convicted under MCL 750.335a(2)(c). Although the general rule when interpreting a statute is to give effect to every word, phrase, and clause and avoid an interpretation that would render any part of the statute nugatory, this principle is not absolute, and in this case must give way to the unmistakable

meanings of the statutes. The only way to harmonize the statutes is to interpret the guidelines as an alternative penalty provision, but this interpretation is not supported by the text. Because the guidelines do not apply, *Arnold I* controls the sentencing of individuals convicted of an indecent-exposure offense as a sexually delinquent person under MCL 750.335a(2)(c). A court may impose the applicable penalty provision in MCL 750.335a(2)(a) or (b), along with any applicable sentencing enhancements, or the "1 day to life" sentence in MCL 750.335a(2)(c). Arnold was not sentenced to either of these options because his sentence reflects the application of the sentencing guidelines. Because the guidelines are not applicable, he was entitled to resentencing.

Judgment reversed and case remanded for resentencing.

Justice CLEMENT, joined by Chief Justice MCCORMACK and Justice CAVANAGH, concurring in the judgment, agreed that the trial court's sentence of 25 to 70 years was invalid because Arnold had to be sentenced either to a term of years under MCL 750.335a(2)(b) (as potentially enhanced by being a fourth-offense habitual offender) or to a "1 day to life" sentence under MCL 750.335a(2)(c). Although the trial court had complied with the sentencing guidelines, the guidelines could not authorize Arnold's sentence because to do so would indirectly amend MCL 750.335a in violation of Const 1963, art 4, § 25. Rather than address the constitutional issue, the majority instead tried to uncover the ordinary meaning of the sentencing guidelines. MCL 750.335a(2)(c) provided a "1 day to life" sentence, while the term-of-years sentence option in MCL 750.335a(2)(b) allowed the trial court to sentence Arnold as a fourth-offense habitual offender to up to a 15-year maximum sentence. By contrast, under MCL 777.16q and MCL 777.62 of the guidelines, Arnold's recommended minimum sentence range as a fourth-offense habitual offender was between 135 and 450 months, and the trial court sentenced him to a minimum sentence of 25 years. The likely reason for these disparate outcomes was a mistake due to the failure of the Legislature's institutional memory between the enactment of MCL 750.335a in 1952 and the enactment of the guidelines in 1998. When enacting the guidelines, the Legislature seemingly concluded that the "1 day to life" language in MCL 750.335a was equivalent to "life or any term of years" and therefore listed indecent exposure by a sexually delinquent person as a Class A felony under the guidelines. The majority concludes that the ordinary meaning of MCL 777.16q is that it does not mean what it says, because interpreting the statute's reference to "Life" as "life or any term of years" requires a series of inferences. However, such inferences are commonplace throughout the guidelines. Rather, the Court had to negate the expression of legislative intent because Michigan constitutional law prevents the adoption of a provision of the Code of Criminal Procedure (i.e., MCL 777.16q) from indirectly amending a provision of the Penal Code (i.e., MCL 750.335a(2)(c)). Under the Reenact-Publish Clause of the Michigan Constitution, Const 1963, art 4, § 25, changes to the law must be in the form of redline edits, i.e., in order to change the law, the Legislature must edit the text rather than enact some inconsistent provision. Therefore, the instructions in the Code of Criminal Procedure for how to sentence someone convicted of an indecent-exposure offense cannot indirectly change the sentencing options in the Penal Code. Justice CLEMENT agreed however with the majority's conclusion that Arnold was entitled to resentencing to either a term-of-years sentence that complied with MCL 750.335a(2)(b) or to a "1 day to life" sentence under MCL 750.335a(2)(c).

# OPINION

Chief Justice:
    Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED  July 28, 2021

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                                No. 160046

LONNIE JAMES ARNOLD,

       Defendant-Appellant.

---

BEFORE THE ENTIRE BENCH

VIVIANO, J.

A person charged with a crime should not have to guess at the penalty he or she faces upon conviction.[1] Yet that is the predicament a defendant faces after being convicted of indecent exposure as a sexually delinquent person under MCL 750.335a. At an earlier

---

[1] See *People v Hall*, 499 Mich 446, 461; 884 NW2d 561 (2016) ("Due process requires 'that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.' ") (citation omitted).

stage of this case, we held that a person found guilty under § 335a(2) of the Penal Code could be sentenced either to a nonmodifiable term of "1 day to life" or to the other applicable statutory penalties established by that statute.[2] However, according to the Court of Appeals' interpretation on remand, such a person would also have to examine MCL 777.16q and MCL 777.62 of the sentencing guidelines in the Code of Criminal Procedure, because the guidelines purport to apply to individuals in defendant's circumstances and suggest that he could face a radically different penalty—imprisonment for life *or* any term of years.

When this case was last before us, we declined to resolve whether § 335a or the guidelines applied in these circumstances. Today, we must confront the clear conflict between the "1 day to life" sentence in § 335a(2)(c) of the Penal Code and the sentence in §§ 16q and 62 of the guidelines. Contrary to the Court of Appeals, we hold that the guidelines do not create an alternative sentence that can be imposed instead of the "1 day to life" sentence in § 335a(2)(c). This means that individuals convicted of an indecent-exposure offense under § 335a as sexually delinquent persons must be sentenced pursuant to the penalties prescribed in that statute as described in our earlier opinion. Because defendant did not receive such a sentence, he is entitled to resentencing.

I. FACTS AND PROCEDURAL HISTORY

Our prior opinion in this case laid out the relevant facts:

> Defendant Lonnie Arnold masturbated in front of an employee at the Monroe Public Library in January 2013. He was charged with aggravated

---

[2] *People v Arnold*, 502 Mich 438, 482-483; 918 NW2d 164 (2018) (*Arnold I*).

2

indecent exposure, MCL 750.335a(2)(b), indecent exposure by a sexually delinquent person, MCL 750.335a(2)(c), and also with being a fourth-offense habitual offender, MCL 769.12. He was convicted after a jury trial on both substantive indecent-exposure counts.[3]

As discussed more below, § 335a(2) provides a penalty of up to one year of imprisonment and a fine for indecent exposure, two years of imprisonment and a fine for aggravated indecent exposure, and an alternative of "1 day to life" imprisonment if the defendant commits either indecent exposure or aggravated indecent exposure and is deemed to have been a sexually delinquent person at the time of the offense.[4] At sentencing, defense counsel argued that § 335a(2)(c) required a sentence of "1 day to life." The trial court disagreed, observing that it was prohibited from imposing a so-called "life tail," under which the maximum penalty is life in prison and the minimum penalty is a term of years.[5] The trial court sentenced defendant to 25 to 70 years' imprisonment on the controlling

---

[3] *Id*. at 444.

[4] A "sexually delinquent person" is defined as "any person whose sexual behavior is characterized by repetitive or compulsive acts which indicate a disregard of consequences or the recognized rights of others, or by the use of force upon another person in attempting sex relations of either a heterosexual or homosexual nature, or by the commission of sexual aggressions against children under the age of 16." MCL 750.10a.

[5] *Arnold I*, 502 Mich at 450; see also MCL 769.9(2) ("The court shall not impose a sentence in which the maximum penalty is life imprisonment with a minimum for a term of years included in the same sentence.").

count of indecent exposure as a sexually delinquent person.[6] The minimum sentence of 25 years was calculated to fit within the sentencing guidelines range.[7]

Defendant appealed his sentence, and the case eventually reached our Court. In a unanimous opinion, we held that the "1 day to life" sentence for indecent exposure as a sexually delinquent person was an alternative to the other sentences provided in § 335a for indecent exposure and aggravated indecent exposure.[8] In other words, a defendant convicted of indecent exposure or aggravated indecent exposure while being a sexually delinquent person could be sentenced either to "1 day to life" or to "the other statutory penalties available under the statute . . . ."[9] This scheme remained intact even after § 335a was amended in 2005.[10] In addition, we held that that the "1 day to life" sentence was not modifiable.[11] That is, a sentence of "1 day to life" was just that: the minimum was one day and the maximum was life, neither of which could be changed.

---

[6] *Arnold I*, 502 Mich at 446. The Court of Appeals set aside defendant's sentence for aggravated indecent exposure for reasons that are not relevant to the present appeal. *Id*. at 446 n 3.

[7] *Id*. at 449 ("The sentencing guidelines list indecent exposure by a sexually delinquent person as a Class A felony, MCL 777.16q, and the proposed scoring of defendant's guidelines variables placed him in cell F-III of the Class A grid, which provides for a minimum sentence of 135 to 225 months, MCL 777.62, the high end of which was then doubled to 450 months because defendant was a fourth-offense habitual offender, MCL 777.21(3)(c).").

[8] *Id*. at 482-483.

[9] *Id*.

[10] *Id*. at 479-480, citing 2005 PA 300.

[11] *Arnold I*, 502 Mich at 469-471.

Because our interpretation of the statute did not account for the sentencing guidelines, we remanded the case to the Court of Appeals to "resolve what effect the adoption of the legislative sentencing guidelines had on the operation of the sexual-delinquency scheme as we have construed it . . . ."[12]  On remand, the Court of Appeals phrased the issue as "reconcil[ing] the optional, alternative sentence of '1 day to life' provided in MCL 750.335a(2) . . . with the classification of indecent exposure (and other designated offenses) by a sexually delinquent person as a Class A felony subject to the sentencing guidelines as provided in MCL 777.16q of the Code of Criminal Procedure."[13] The need to reconcile these statutes resulted from the fact that the guidelines provide ranges of sentences that depart from the "1 day to life" sentence included in § 335a(2)(c).

In attempting to resolve this tension between the sentencing frameworks, the Court of Appeals observed the interpretive principle that statutes involving the same subject matter should be read *in pari materia*, i.e., construed together to avoid conflict.[14]  After determining that the guidelines and § 335a both concerned the same subject matter, the Court of Appeals concluded that "the sentencing guidelines provide yet another sentencing alternative for individuals convicted of indecent exposure as a sexual delinquent."[15] Accordingly, a trial court could sentence a defendant in these circumstances to "(a) one

---

[12] *Id*. at 481.

[13] *People v Arnold (On Remand)*, 328 Mich App 592, 604; 939 NW2d 690 (2019) (*Arnold II*).

[14] *Id*. at 606.

[15] *Id*. at 610.

5

day to life for indecent exposure by a sexually delinquent person, MCL 750.335a(2)(c), or (b) a sentence premised on a scoring of the guidelines, MCL 777.16q, which in this case could be enhanced under the habitual-offender statute, MCL 777.21."[16]  Because the trial court "was not aware of its range of sentencing options" when it sentenced defendant, the Court of Appeals vacated defendant's sentence and remanded the case for resentencing.[17]

Defendant then sought leave to appeal in this Court. We granted the application and ordered argument on, among other things, whether the offense of "indecent exposure by a sexually delinquent person . . . is subject to the sentencing guidelines . . . because it is set forth in MCL 777.16q as a listed felony."[18]

## II.  STANDARD OF REVIEW

We review issues of statutory interpretation de novo.[19]

## III.  ANALYSIS

The issue presented is whether the guidelines expand on the sentences available for an individual convicted under § 335a of indecent exposure or aggravated indecent exposure as a sexually delinquent person.  More specifically, we must decide whether, as an

---

[16] *Id*.  The Court of Appeals also rejected defendant's argument that, under its construction of the statutes, the sentencing guidelines functioned as an unconstitutional amendment of § 335a by amending that statute without reenacting and republishing it as required by Const 1963, art 4, § 25.  *Id*. at 613-614.  The Court of Appeals did not read the relevant guidelines provision, § 16q, as an amendment of § 335a; each was "independent and complete" and did not necessitate reference to another statute to ascertain its meaning.  *Id*. at 614.

[17] *Id*. at 596.

[18] *People v Arnold*, 505 Mich 1001 (2020) (*Arnold III*).

[19] *Arnold I*, 502 Mich at 447.

6

alternative to the penalty in § 335a(2)(c), such a defendant can be sentenced under the guidelines, i.e., whether the guidelines constitute a substantive penalty provision that allows for a sentence other than an unmodifiable sentence of one day to life. We find that § 335a(2)(c) and the guidelines offer conflicting sentences but that the latter do not create an alternative penalty provision. Thus, the only penalties that can be imposed are those under § 335a(2), as interpreted by our decision in *Arnold I*.

## A. STATUTORY BACKGROUND

Section 335a defines the offenses of indecent exposure and aggravated indecent exposure, lays down the penalties for these offenses, and establishes an alternative sentence that is available when a defendant commits one of these offenses while being a sexually delinquent person. The statute states, in relevant part:

> (1) A person shall not knowingly make any open or indecent exposure of his or her person or of the person of another.

> (2) A person who violates subsection (1) is guilty of a crime, as follows:

> (a) Except as provided in subdivision (b) or (c), the person is guilty of a misdemeanor punishable by imprisonment for not more than 1 year, or a fine of not more than $1,000.00, or both.

> (b) If the person was fondling his or her genitals, pubic area, buttocks, or, if the person is female, breasts, while violating subsection (1), the person is guilty of a misdemeanor punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both.

> (c) If the person was at the time of the violation a sexually delinquent person, the violation is punishable by imprisonment for an indeterminate term, the minimum of which is 1 day and the maximum of which is life.[20]

---

[20] MCL 750.335a. When the prosecution seeks to charge an individual for either type of indecent exposure while being a sexually delinquent person, the individual must be charged

7

As noted above, in *Arnold I*, we interpreted this language to allow an individual convicted of an indecent-exposure offense as a sexually delinquent person to be sentenced to either "1 day to life" under § 335a(2)(c) or to the appropriate penalty in § 335a(2)(a) or (b).[21] And, as also mentioned, the sentence under § 335a(2)(c) must be precisely "1 day to life."

The guidelines, however, contemplate a different range of sentences for an individual found guilty under § 335a(2)(c). In § 16q, the guidelines specifically refer to § 335a(2)(c): "This chapter [that is, Chapter 777 of the Code of Criminal Procedure, which sets out the sentencing guidelines] applies to the following felonies enumerated in chapter 750 of the Michigan Compiled Laws: . . . [MCL] 750.335a(2)(c) . . . ."[22] The table set forth in § 16q, shown below in relevant part, indicates that § 335a(2)(c) is a Class A felony with a statutory maximum of life imprisonment:

---

with the underlying indecent-exposure offense and charged as a sexually delinquent person. MCL 767.61a. "Upon a verdict of guilty to the first charge or to both charges or upon a plea of guilty to the first charge or to both charges the court may impose any punishment provided by law for such offense." MCL 767.61a.

[21] See *Arnold I*, 502 Mich at 448-449 ("[I]ndecent exposure is a one-year misdemeanor, with aggravated circumstances making it a two-year 'misdemeanor,' but when committed by a 'sexually delinquent person,' the offense 'is punishable by imprisonment for an indeterminate term, the minimum of which is 1 day and the maximum of which is life.' "), quoting MCL 750.335a(2)(c).

[22] Formatting altered.

8

| M.C.L. | Category | Class | Description | Stat Max |
|--------|----------|-------|-------------|----------|
| 750.332 | Property | H | Entering horse in race under false name | 4 |
| 750.335a(2)(b) | Person | G | Aggravated indecent exposure | 2 |
| 750.335a(2)(c) | Person | A | Indecent exposure by sexually delinquent person | Life |

The guidelines "grid" for Class A felonies, set out in § 62 of the guidelines, provides for various minimum sentence ranges, from 21 months in prison at the low end to life imprisonment at the high end.[23] In other words, the grid lays out a range of possible minimum sentences for term-of-years sentences—in contrast to the "1 day to life" sentence in § 335a(2)(c)—depending on the scoring of the guidelines. For example, an offense variable score of 40 to 59 points, together with a prior record variable score of 25 to 49 points, results in a recommended minimum sentence range of 108 to 180 months in prison.[24]

The problem presented by §§ 16q and 62 is that they appear to allow for sentences that clash with the "1 day to life" sentence in § 335a(2)(c). Under our interpretation of the "1 day to life" scheme in *Arnold I*, the language in § 335a(2)(c) requires an exact sentence of "1 day to life," unless one of the other applicable sentences in § 335a(2)(a) or (b) is imposed. But if §§ 16q and 62 establish sentences that vary from this scheme, these statutes cannot be read as simply doing what the other sentencing guidelines do: guiding the

[23] MCL 777.62.

[24] MCL 777.62.

imposition of a penalty established in the Penal Code or elsewhere.[25] That is, §§ 16q and 62 would not merely guide the trial court's discretion in sentencing an individual pursuant to the penalty prescribed in the substantive offense statute. For § 335a(2)(c) to be consistent with the guidelines, the "1 day to life" scheme would need to be modifiable; i.e., "1 day to life" would need to mean " 'life or any term of years,' such that a sentencing court may impose any sentence, including the one imposed here." *Arnold I*, 502 Mich at 452. We rejected that interpretation in *Arnold I*.[26]

---

[25] Cf. *People v Lockridge*, 498 Mich 358, 417-418; 870 NW2d 502 (2015) (MARKMAN, J., dissenting) ("Under Michigan's indeterminate sentencing guidelines, a criminal defendant's maximum sentence is prescribed by statute, and upon a guilty verdict the defendant is made subject to serving this maximum sentence. . . . That is, the jury's guilty verdict authorizes punishment of a criminal defendant to the maximum extent allowed by the statute under which he or she has been convicted."); *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (noting that the sentencing guidelines "prescribed detailed instructions for imposing sentences, thereby reducing" the judge's exercise of discretion); *People v Drohan*, 475 Mich 140, 161; 715 NW2d 778 (2006) ("The maximum sentence is not determined by the trial court, but rather is set by law. Michigan's sentencing guidelines . . . create a range within which the trial court must set the minimum sentence. However, a Michigan trial court may not impose a sentence greater than the statutory maximum."), rev'd on other grounds by *Lockridge*, 498 Mich 358, 378-379.

[26] It is, of course, possible that the Legislature misunderstood the "1 day to life" sentence in § 335a(2)(c) as meaning "life or any term of years" when—in 2005, before we gave the statute an authoritative interpretation and discerned its original meaning—it made the last relevant amendments to § 335a(2) and § 16q. See 2005 PA 300 (amending § 335a by adding Subsection (2)(c) and moving the "1 day to life" sentence to that subsection); 2005 PA 302 (amending § 16q by adding a reference to § 335a(2)(c) and stipulating that the amendment would not become effective until 2005 PA 300 took effect). In fact, the concurrence takes this view further and interprets § 16q as amending the meaning (but not the text) of the "1 day to life" sentence in § 335(a)(2) so that the latter statute now allows for sentences of "life or any term of years." But the concurrence cites no authority for this conclusion and provides no examples of when this has occurred before. And the 2005 amendment of § 335a(2) made no relevant alterations to the language reflecting a new understanding of the statute. *Arnold I*, 502 Mich at 479-480. This strongly indicates that no change in meaning was intended. See *People v Pinkney*, 501 Mich 259, 282 n 55; 912

The "alternative" penalty the Court of Appeals discerned in the guidelines is thus independent of any other statutory penalty provision. The only way this penalty can apply, therefore, is if this provision—unlike any other provision in the sentencing guidelines that we are aware of—serves as the relevant penalty provision for conduct criminalized in § 335a of the Penal Code, and if this is so, it is true despite the fact that § 335a itself appears to specify all the possible penalties.[27] Stated differently, do the guidelines create a substantive penalty provision for § 335a(2)(c), authorizing courts to impose that penalty to the exclusion of the penalty actually set forth in § 335a(2)(c)?[28]

NW2d 535 (2018) ("If it is true (and we think it is) that 'a change in the language of a prior statute presumably connotes a change in meaning,' . . . the converse seems even more obviously true: namely, that no change in the text connotes no change in its meaning."); Cooley, Constitutional Limitations (5th ed), pp 76-77 ("[I]f the new instrument re-enacts in the same words provisions which it supersedes, it is a reasonable presumption that the purpose was not to change the law in those particulars, but to continue its uninterrupted operation. This is the rule in the case of statutes . . . ."). Moreover, the Legislature's possible misinterpretation of an earlier enacted statute provides "a hazardous basis for inferring the intent of an earlier" Legislature, even when that misinterpretation plays a role in the crafting of subsequent legislation. See *United States v Philadelphia Nat'l Bank*, 374 US 321, 348-349; 83 S Ct 1715; 10 L Ed 2d 915 (1963) (quotation marks and citation omitted). Thus, the Legislature's possible misinterpretation of § 335a(2)(c) does not bear on our interpretation of that statute or how it relates to the guidelines.

[27] Section 16q does cover three other gross-indecency crimes that also include a "1 day to life" alternative sentence similar to that in § 335a(2)(c). See MCL 777.16q (citing MCL 750.338, MCL 750.338a, and MCL 750.338b). As here, those crimes when committed by a sexually delinquent person are placed on the same Class A felony grid in § 62. Of the 1,120 crimes covered by the sentencing guidelines, these four crimes involving sexual delinquency appear to be the only offenses for which, according to the Court of Appeals' interpretation, the guidelines set forth a substantive penalty.

[28] Cf. *Pinkney*, 501 Mich at 269 (defining "penalty provision" as "a provision providing the penalty for [a] crime"); see generally *Black's Law Dictionary* (11th ed) (defining "penalty" as the "[p]unishment imposed on a wrongdoer, usu[ally] in the form of

11

## B.  INTERPRETATION OF THE GUIDELINES

To answer this question, we must uncover the ordinary meaning of the guidelines.[29] Critically, the guidelines do not purport to trump the substantive penalties prescribed in the statutes establishing the criminal offense.  In fact, the Legislature has subordinated the guidelines to the applicable penalty provisions in the substantive criminal statutes.  Under MCL 769.34(2)(a), "If a statute mandates a minimum sentence for an individual sentenced to the jurisdiction of the department of corrections, the court shall impose a sentence in accordance with that statute."  Here, as *Arnold I* establishes, the "1 day to life" scheme in § 335a(2)(c) is unmodifiable and serves as an alternative to the penalties in § 335a(2)(a) and (b).  Section 335a(2)(c) establishes a mandatory minimum of one day and makes no allowance for variances.[30]  Accordingly, under MCL 769.34(2)(a), the court must impose the sentence in § 335a(2)(c) itself or, under *Arnold I*, the applicable alternative in § 335a(2)(a) or (b).

Nothing in the text of § 16 or § 62 suggests otherwise.  Indeed, these two sections contain scarcely any "text" at all in the usual sense.  One is primarily a table and the other primarily a grid.  Both statutes contain mostly numbers or citations and short phrases that refer to other statutes.  Neither statute expressly states that individuals found guilty under § 335a(2)(c) can be punished by any term of years, as seems to be envisioned by the grid, or by any other alternative sentence.

imprisonment or fine," and "statutory penalty" as the "penalty imposed for a statutory violation").

[29] See *Pinkney*, 501 Mich at 268.

[30] *Arnold I*, 502 Mich at 469-471, 483.

12

The only possible textual basis for the term-of-years sentence is a reference in § 16q to "Life" as the "Stat Max" (statutory maximum sentence) for convictions under § 335a(2)(c). Nothing in the text indicates that the term "Life" in § 16q can encompass any term of years, such as the 70-year maximum sentence the trial court dispensed in this case. One would have to interpret "Life" to mean "life *or* any term of years." This would cut against not only the meaning of "life" imprisonment, but also our caselaw treating life sentences and term-of-years sentences as mutually exclusive.[31] At best, the reader would need to work through a series of inferences in order to conclude that "Life" could also mean "any term of years": (1) the guidelines grid provides for a minimum term-of-years sentence for convictions under § 335a(2)(c); (2) but life tails (i.e., sentences of a minimum number of years with a maximum of life) are prohibited by MCL 769.9(2); (3) therefore, a defendant may not be sentenced to a minimum term of years with a maximum of life; (4) it would then follow that the maximum must be "life *or* any term of years." In other words, if the maximum was life, then there could never be a minimum for a term of years, and

---

[31] See *Arnold I*, 502 Mich at 472-473 (construing the "1 day to life" sentence, as adopted, "as being an alternative sentencing option that existed *alongside* other options, such as a life sentence or a term of years"); see generally *People v Johnson*, 421 Mich 494, 498; 364 NW2d 654 (1984) ("The sentence concepts 'life' and 'any term of years' are mutually exclusive . . . .").

13

consequently, the grid establishing such a minimum would be superfluous.[32] This would

be an extremely circuitous path for establishing a substantial maximum penalty.[33]

While "life" might be the only possible maximum sentence for a violation of

§ 335a(2)(c), it is hard to see how § 16q itself imposes this sentence. Such an interpretation

would require a determination that the phrase "Stat Max" is a self-reference to § 16q. That

is, if § 16q creates and imposes the life maximum sentence, then the "statute" implicitly

referred to in the "Stat Max" column would be *that very* section, i.e., § 16q. But this

conclusion is belied by the fact that all the other offenses in the § 16q sentencing grid and

all of the offenses in the other relevant sentencing grids in the guidelines indicate that the

"statute" referred to in the "Stat Max" column is the relevant Penal Code statute listed in

the grid. The most natural reading of "Stat Max" is that it refers to the maximum sentence

---

[32] The concurrence points out that the guidelines sometimes use the term "Life" under the "Stat Max" column to refer to sentences of "life or any term of years." *Post* at 7. The concurrence suggests that "Life," as used in that column, almost always means "life or any term of years." But as the concurrence seems to recognize, this is because the penalty established by the substantive criminal statute provides for such a penalty. Thus, "Life" means "life or any term of years" only when the substantive penalty provision establishes a statutory maximum term of "life or any term of years." For example, the "Stat Max" for first-degree arson is listed as "Life," MCL 777.16c, but the applicable penalty provision allows for "imprisonment for life or any term of years," MCL 750.72(3). In such cases, the concurrence is correct that "Life" is a "shorthand" for the substantive penalty offense. But this is not one of those cases. Section 335(a)(2) does not provide a "life or any term of years" penalty. Thus, to interpret the reference to "Life" in § 16q as "life or any term of years" requires the interpretive leaps spelled out above.

[33] Defendants should not be forced to run through such interpretive gymnastics to reveal the meaning of a criminal statute. See *Pinkney*, 501 Mich at 268 ("It has long been our rule that '[a] criminal statute ought to be so plain and unambiguous that "he who runs" may read, and understand whether his conduct is in violation of its provisions.'") (citation omitted; alteration in original).

14

contained in the statute listed in the first column; in this case, that statute is § 335a(2)(c).

Under this reading, § 16q confirms that § 335a(2)(c) establishes the substantive penalty.

Another strong indication that the guidelines did not smuggle a substantive penalty

provision into § 16q is the very title of the act that the guidelines fall within: the "Code of

Criminal Procedure."[34]  The term "procedure" is usually used in contradistinction to

"substantive"; substantive criminal laws are generally thought to encompass the definitions

of the crimes *and* the penalties for the crimes.  A leading treatise states that "[t]he

substantive criminal law is that law which . . . declares what conduct is criminal and

prescribes the punishment to be imposed for such conduct."[35]  Other courts have agreed.[36]

Indeed, so critical is the penalty to "substantive criminal law" that "conduct cannot be

---

[34] MCL 760.1.  The "Code of Criminal Procedure" is the short title of 1927 PA 175, but the full title similarly makes clear that the Code of Criminal Procedure involves "the laws relating to criminal procedure . . . ." 1927 PA 175, title.  A title is a "permissible indicator[] of meaning," provided it is not used to override the statutory text.  Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), pp 221-222.  And we have stated that our Constitution requires "[t]he body of [a] statute [to] reasonably harmonize" with its title.  *McKellar v Detroit*, 57 Mich 158, 159; 23 NW 621 (1885).

[35] 1 LaFave, Substantive Criminal Law (3d ed), § 1.2, p 11; cf. *People v Beck*, 504 Mich 605, 640; 939 NW2d 213 (2019) (VIVIANO, J., concurring), quoting *Apprendi v New Jersey*, 530 US 466, 479-480; 120 S Ct 2348; 147 L Ed 2d 435 (2000) (noting that historically, "[t]he substantive criminal law tended to be sanction-specific; it prescribed a particular sentence for each offense") (cleaned up).

[36] See *Kansas v Sheppard*, 56 Kan App 2d 1193, 1203; 444 P3d 1006 (2019) ("The penalty provisions of a criminal offense are substantive and therefore . . . will only operate retrospectively if the statute's language expresses a clear legislative intent to do so."); *In re Hall*, 433 SW3d 203, 214 (Tex App, 2014) ("Laws which do not amend substantive law by defining criminal acts or providing for penalties are procedural in nature.").

15

called 'criminal' unless a punishment is prescribed therefor."[37] This is why the normal drafting convention for criminal statutes is to place the penalty as near as possible to the prohibited conduct.[38] Procedure, by contrast, is "the law governing that series of procedures through which the substantive criminal law is enforced."[39]

We have taken a similar view, quoting the Penal Code's title for the proposition that "the purpose of the Penal Code is 'to define crimes and prescribe the penalties therefor . . . .' "[40] By contrast, as we have recognized, "[t]he purpose of the Code of Criminal Procedure is to 'codify the laws relating to criminal procedure . . . ."[41] The contents of the Code of Criminal Procedure bear out this observation. The Code of Criminal Procedure spans 20 chapters in the Michigan Compiled Laws (MCLs), none of

---

[37] 1 LaFave, Substantive Criminal Law, § 1.2, p 12; see also *id.* at § 1.2(d), pp 18-19 ("We have seen that a crime is made up of two parts, forbidden conduct and a prescribed penalty. The former without the latter is no crime.").

[38] See generally *id.* at § 1.2(d), p 19 ("In many cases the section of the statute which describes the forbidden conduct concludes with a statement of the punishment; or perhaps one section sets forth the forbidden conduct and the next section the punishment."); 1A Singer & Singer, Sutherland Statutory Construction (7th ed), § 20:18, pp 146-147 (noting the "[c]ommon legislative practice" of "includ[ing] many penalty sections in every statute" under the theory that the penalty provision should be "set forth immediately" after the standard of conduct, but advocating for penalty provisions to be placed at the end of the act and to "provide that any violation of the provisions of the act is punishable according to the terms of the penalty section").

[39] 1 LaFave, Criminal Procedure (4th ed), § 1.1(a), p 3.

[40] *People v Smith*, 423 Mich 427, 442; 378 NW2d 384 (1985), quoting 1931 PA 328, title (the *Smith* Court referred to the act's textual title as a preamble).

[41] *Smith*, 423 Mich at 442, quoting 1927 PA 175, title (the *Smith* Court referred to the act's textual title as a preamble).

which involves the direct creation of crimes or the imposition of core penalties.[42] Indeed, were we to hold that §§ 16q and 62 establish a substantive penalty, it would appear to be the only such penalty located in the guidelines.

The conclusion that §§ 16q and 62 are not substantive penalty provisions finds support in caselaw from across the country. As the United States Supreme Court has observed, the nonstatutory federal guidelines "do not regulate the public by prohibiting any conduct or by 'establishing minimum and maximum penalties for [any] crime.' . . . Rather, the Guidelines advise sentencing courts how to exercise their discretion within the bounds established by Congress."[43] Other courts have agreed. In addressing statutory sentencing guidelines, the Washington Supreme Court stated, "Sentencing guidelines do not inform the public of the penalties attached to criminal conduct nor do they vary the statutory

---

[42] Instead, the chapters of the Code of Criminal Procedure encompass "provisions for the proper procedures to be followed," *Smith*, 423 Mich at 442; more specifically, they involve the powers and duties of the courts in criminal matters (Chapter II; MCL 762.1 *et seq*.), the rights of the accused (Chapter III; MCL 763.1 *et seq*.), provisions for arrests (Chapter IV; MCL 764.1 *et seq*.), bail (Chapter V; MCL 765.1 *et seq*.), examination of offenders (Chapter VI; MCL 766.1 *et seq*.), pretrial proceedings (Chapter VII; MCL 767.1 *et seq*.), investigative subpoenas and immunity (Chapter VIIA; MCL 767A.1 *et seq*.), trials (Chapter VIII; MCL 768.1 *et seq*.), judgments and sentences (Chapter IX; MCL 769.1 *et seq*.), post-trial motions (Chapter X; MCL 770.1 *et seq*.), probation (Chapters XI and XIA; MCL 771.1 *et seq*. and MCL 771A.1 *et seq*.), crime-prevention proceedings (Chapter XII; MCL 772.1 *et seq*.), criminal investigations (Chapter XIII; MCL 773.1 *et seq*.), jurisdiction and procedure in justices' courts (Chapter XIV; MCL 774.1a *et seq*.), fees (Chapter XV; MCL 775.1 *et seq*.), miscellaneous provisions (such as extradition) (Chapter XVI; MCL 776.6 *et seq*.), and the sentencing guidelines (Chapter XVII; MCL 777.1 *et seq*.).

[43] *Beckles v United States*, 580 US ___, ___; 137 S Ct 886, 895; 197 L Ed 2d 145 (2017). *Beckles* and related cases rejected constitutional vagueness challenges to the sentencing guidelines. Because that issue is not present in this case, we take no position on it.

maximum and minimum penalties assigned to illegal conduct by the legislature."[44]  One of

the Washington court's rationales applies here as well: the guidelines only "structure

discretionary decisions affecting sentences; they do not specify that a particular sentence

must be imposed."[45]  In a similar vein, neither § 16q nor § 62 mandates a particular

sentence or range of sentences; as discussed above, the guidelines do not establish discrete

penalties and do not supplant the penalties specified in the substantive criminal statute.

For these reasons, §§ 16q and 62 cannot be read to authorize sentence ranges that

serve as an alternative to the penalty laid out in § 335a(2)(c).[46]  It follows from this

conclusion that the reference in § 16q to § 335a(2)(c) is nugatory and that § 62 therefore

does not apply to individuals found guilty under § 335a(2)(c).  We acknowledge that this

is an unusual result and emphasize it is one we reach only after close scrutiny of the

---

[44] *State v Baldwin*, 150 Wash 2d 448, 459; 78 P3d 1005 (2003); see also *id*. ("A citizen reading the guideline statutes will not be forced to guess at the potential consequences that might befall one who engages in prohibited conduct because the guidelines do not set penalties."); see also *State v Rourke*, 773 NW2d 913, 918 (Minn, 2009) (agreeing with federal caselaw holding that sentencing guidelines do not establish the criminal conduct but simply serve as directions to guide judges during sentencing).

[45] *Baldwin*, 150 Wash 2d at 461.

[46] Our decision in *People v Buehler*, 477 Mich 18, 20, 24; 727 NW2d 127 (2007), held that probation was not an alternative penalty available for sexually delinquent persons convicted under § 335a.  In our discussion, we stated in dicta that the guidelines controlled over a prior version of § 335a.  But the basis for this conclusion was the Court of Appeals' observation that although the applicable version of § 335a was the more specific provision, which usually controls, the sentencing guidelines were enacted after that version.  *People v Buehler*, 271 Mich App 653, 658-659; 723 NW2d 578 (2006).  That is no longer the case, as the versions of § 335a and the guidelines at issue were enacted together.  See 2005 PA 300 and 2005 PA 302.  In any event, *Arnold I*, 502 Mich at 473-477, 481, disavowed our decision in *Buehler* and held it was "no longer . . . a binding statement of the proper interpretation of these statutes."

18

statutes.[47] "[A]s a general rule, 'we must give effect to every word, phrase, and clause and avoid an interpretation that would render any part of the statute surplusage or nugatory.' "[48] But this principle is not absolute, and here it must give way to the unmistakable meaning of the statutes.[49] Sections 16q and 62 clash with § 335a(2)(c). The former statutes contemplate sentences that are nowhere provided for in the latter. The only way to make these statutes cohere is to interpret the guidelines as an alternative penalty provision. But for the reasons above, such an interpretation is unwarranted.[50] In these circumstances, our duty is to accord the text its ordinary meaning even if that meaning leads us to conclude that some of the text—the reference in § 16q to § 335a(2)(c) and the resulting application of § 62 to individuals found guilty under § 335a(2)(c)—is nugatory.[51]

---

[47] Of course, the Legislature may, within constitutional bounds, establish whatever penalty it desires for violation of § 335a. We simply determine today that the Legislature has not done so through the sentencing guidelines.

[48] *Pinkney*, 501 Mich at 282 (citation omitted).

[49] See *id*. at 283.

[50] In an understandable effort to avoid this conclusion, the Court of Appeals relied on the *in pari materia* canon, under which we endeavor to read statutes concerning the same general subject as harmonious, if possible. *Int'l Business Machines Corp v Dep't of Treasury*, 496 Mich 642, 652; 852 NW2d 865 (2014) (opinion by VIVIANO, J.). This canon, however, aims to uncover a statute's ordinary meaning and therefore cannot be invoked to rewrite the statute. See *SBC Health Midwest, Inc v Kentwood*, 500 Mich 65, 74; 894 NW2d 535 (2017) (declining to use the canon to incorporate terms from one statute into a related statute). Here, such rewriting is exactly what would be needed to transform §§ 16q and 62 into a substantive penalty provision. The canon cannot do this much work, and thus, we disagree with the Court of Appeals' application of it in this case.

[51] *Pinkney*, 501 Mich at 287-288. The rule of lenity offers another potential prism through which to view our result, although applying this interpretive principle here is unnecessary and we decline to do so. The rule of lenity stands for the proposition that penal laws are to be strictly construed, with all doubts resolved in a defendant's favor. *Bell v United States*,

## C. APPLICATION

Because the sentencing guidelines do not apply, our decision in *Arnold I* controls the sentencing of individuals convicted of an indecent-exposure offense under § 335a as sexually delinquent persons. A court may impose (1) the applicable penalty laid out in § 335a(2)(a) or (b), along with any applicable sentence enhancements or (2) the "1 day to life" sentence in § 335a(2)(c). In this case, defendant's sentence is not to either of these options. Because we hold that the guidelines are inapplicable, defendant is entitled to resentencing.[52]

---

349 US 81, 83; 75 S Ct 620; 99 L Ed 905 (1955). The rule applies only when the statutory text is ambiguous, *People v Wakeford*, 418 Mich 95, 113-114; 341 NW2d 68 (1983), such as when "a provision of the law . . . irreconcilably conflicts with another provision . . . ." *Mayor of Lansing v Pub Serv Comm*, 470 Mich 154, 166; 680 NW2d 840 (2004) (cleaned up). The statutes here clash, and defendant certainly believes the penalties in § 335a(2) are more lenient than those under the guidelines. Whether he is correct is a question we need not answer. The guidelines do not establish a penalty, they simply (and unsuccessfully) attempt to describe the penalties authorized by § 335a(2)(c). They therefore give way to § 335a.

[52] The parties dispute whether § 335a(2)(c) is a distinct felony. It is labeled as such in § 16q, but *Arnold I*, 502 Mich at 479-480, held that it was simply an alternative sentencing option for a sexually delinquent person who was convicted of an underlying indecent-exposure offense. We see no reason to reconsider this conclusion and, in any event, the result we reach would be the same regardless of how § 335a(2)(c) is characterized. Whether a sentencing option or a chargeable offense, the "1 day to life" scheme in § 335a(2)(c) conflicts with the guidelines. Those guidelines do not constitute an alternative penalty that can be imposed on an individual convicted of an indecent-exposure offense as a sexually delinquent person.

Our holding today also renders it unnecessary to resolve the constitutional question raised in our grant order. See *Arnold III*, 505 Mich at 1001. In addressing the constitutional issue, the concurrence implies that our order granting leave in this case did not request briefing on the interpretation of the statutes, which forms the basis for our holding. See *post* at 2, 20. But that is simply incorrect. The Court of Appeals below directly addressed the interpretation of the relevant statutes, and our grant order asked whether the offense of

20

IV. CONCLUSION

This is not a typical criminal case. It has taken defendant two trips to this Court to get a clear answer on what sentence he faces for his conviction under § 335a(2)(c). The core confusion has come from the lower courts' construction of §§ 16q and 62 of the guidelines as both creating a substantive penalty and guiding its imposition. But we have never interpreted the sentencing guidelines as establishing substantive penalties. And a close of reading of §§ 16q and 62 reveals that, contrary to the decisions below, these guidelines should be interpreted no differently from the rest. While the "1 day to life" sentence in § 335a(2)(c) is inconsistent with the sentences contemplated by the guidelines in §§ 16q and 62, these latter provisions fail to establish any substantive penalties. As a

indecent exposure by a sexually delinquent person under § 16q is subject to the guidelines. *Arnold III*, 505 Mich at 1001.

In any event, by avoiding this question, we adhere to our well-established principle of deciding cases on nonconstitutional grounds when possible. See *J&J Constr Co v Bricklayers & Allied Craftsmen, Local 1*, 468 Mich 722, 734; 664 NW2d 728 (2003) ("This Court will not unnecessarily decide constitutional issues, . . . and it is an undisputed principle of judicial review that questions of constitutionality should not be decided if the case may be disposed of on other grounds."). Avoiding unnecessary constitutional issues protects the separation of powers and is a central component of the concept of judicial power. See *Rescue Army v Muni Court of Los Angeles*, 331 US 549, 569-571; 67 S Ct 1409; 91 L Ed 1666 (1947); *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 614-615; 684 NW2d 800 (2004), rev'd on other grounds by *Lansing Schs Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349 (2010). A decision on constitutional grounds—unlike the one we reach today—places limitations on the Legislature's power and should not be done unless necessary to the case. The concurrence fails to show that this course is necessary. In reaching the constitutional issue, the concurrence assumes that the Legislature intended some change in meaning but never decides whether the Legislature actually accomplished that change in the statutory text. Essentially, the concurrence assumes an interpretation of the statute in order to address whether the statute represents an unconstitutional amendment. Suffice it to say, this is not our usual approach. See *Washtenaw Co v State Tax Comm'n*, 422 Mich 346, 371; 373 NW2d 697 (1985) ("[W]henever possible, interpretations that result in constitutional invalidity will be avoided.").

21

result, defendants found guilty under § 335a(2)(c) can be sentenced to the penalties in § 335a, along with any applicable enhancements, as discussed in our opinion in *Arnold I*. Accordingly, we reverse the Court of Appeals' judgment to the contrary and remand for resentencing consistent with this opinion.

David F. Viviano
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                            No. 160046

LONNIE JAMES ARNOLD,

      Defendant-Appellant.

_____

CLEMENT, J. (*concurring in the judgment*).

I agree with the result reached by the majority—defendant must either be given a term-of-years sentence under MCL 750.335a(2)(b), or a "1 day to life" sentence under MCL 750.335a(2)(c). Because his sentence of 25 to 70 years in prison exceeds the permissible term of years sentence authorized by MCL 750.335a(2)(b) (as potentially enhanced by being a fourth-offense habitual offender, MCL 769.12(1)(c)), it is invalid.

To reach this result, we must overcome a formidable obstacle: the sentencing guidelines, 1998 PA 317—a formal expression of legislative intent—amended the Code of Criminal Procedure, MCL 760.1 *et seq*., in such a way as to appear to authorize defendant's sentence. This Court must provide an answer for why the trial court's compliance with the sentencing guidelines is not sufficient to authorize defendant's sentence. The Michigan Constitution provides a tool that, although used infrequently, is purpose-built for overcoming this obstacle: Const 1963, art 4, § 25, which requires that any legislative intent to change the punishments for this crime be expressed in a particular way to be legally effective. In the name of constitutional avoidance, the majority refuses to use this tool,

instead asserting that it has "uncover[ed] the ordinary meaning of the guidelines" and, in doing so, concludes that a portion of MCL 777.16q is "nugatory," an admittedly "unusual result" which is still "the unmistakable meaning of" the sentencing guidelines. I prefer to resolve the case on the basis (1) presented to us by the parties, (2) on which we granted leave,[1] and (3) which most clearly has the power to nullify the application of a duly enacted statute: the guidelines cannot authorize defendant's sentence because that result would indirectly amend MCL 750.335a in violation of Const 1963, art 4, § 25.

The first problem we confronted in this case was the somewhat-confusing "1 day to life" sentence the Legislature provided for when it adopted the "sexually delinquent person" scheme in 1952. As we described when this case was last before us, this option to impose a "1 day to life" sentence on convicted individuals had an established meaning when it was adopted. There was a collection of predicate offenses, each of which had certain term-of-years punishments expressed in the Michigan Penal Code, MCL 750.1 *et seq.*; if an individual was convicted of being a sexually delinquent person at the time of

---

[1] The majority insists that I am "simply incorrect" to question whether "the basis for [its] holding" was in our grant order. We granted leave on "whether indecent exposure by a sexually delinquent person is a distinct felony 'enumerated' in the Michigan Penal Code and subject to the sentencing guidelines, or whether the offense is subject to the sentencing guidelines regardless because it is set forth in MCL 777.16q as a listed felony." *People v Arnold*, 505 Mich 1001, 1001 (2020). The majority's conclusion that MCL 777.16q does not purport to express a legislative intention of a substantive punishment for this offense is not, in my view, responsive to that question, and even if a very broad interpretation of our grant order encompassed the majority's reasoning, nothing like that reasoning can be found anywhere in the parties' briefing. I do not believe we are obliged to confine ourselves to the parties' briefs where neither party has presented the Court with arguments the Court believes are correct—we ought not allow poor party presentation to compel us to make bad law—but where the parties' presentation of the case presents a legally proper solution, I think it is preferable for us to address the case as it has been presented.

2

committing the predicate offense, the individual could also be sentenced to a nonmodifiable sentence of "1 day to life" at the option of the sentencing court. This "1 day to life" sentence was nonmodifiable because it was intended to be therapeutic rather than punitive and thus represented a sort of judicial forfeiture of control over the amount of time a defendant would serve. Instead, a defendant would be incarcerated until experts determined he could safely rejoin society. The choice turned on whether, in the judgment of the sentencing court, the offender suffered from what the law treated as a mental health problem. See generally *People v Arnold*, 502 Mich 438; 918 NW2d 164 (2018). Under this system, the trial court here had the choice of either giving defendant a "1 day to life" sentence or a term-of-years sentence. If it opted for a term-of-years sentence, the statutory maximum for defendant's offense is two years, MCL 750.335a(2)(b), and his status as a fourth-offense habitual offender would allow the trial court to extend the maximum from two years to as many as 15 years (180 months), MCL 769.12(1)(c). Under MCL 769.34(2)(b), defendant's minimum sentence could not be more than $^2/_3$ of the maximum sentence, making his absolute "maximum minimum" a 120-month minimum sentence. Defendant's 25- to 70-year sentence clearly is not a permissible sentence under this regime.

The problem arises when these sentencing options in MCL 750.335a intersect with how the sentencing guidelines direct trial courts to sentence those convicted of defendant's offense. The sentencing guidelines consist of several components. First, there is a massive series of tables listing essentially every felony in Michigan, its statutory maximum penalty, and its classification level. The classification level generally corresponds with the maximum penalty:

> In general, though there are several hundred exceptions, an offense punishable by life imprisonment is in class A, a 20-year offense is in class B, a 15-year offense is in class C and a 10-year offense is in class D. Similarly, a five-year offense is in class E, a four-year offense is in class F, and two-year offenses are in class G.[2]  There is also a class H.  [Hammond, *The Top 50 Felonies: Useful Statistics Regarding the Most Frequently Charged Offenses*, 81 Mich B J 20, 22 (December 2002).]

There is also a series of "offense variables" (OVs) and "prior record variables" (PRVs), which direct the sentencing judge to assess points to the defendant based on various aspects of the offense and the defendant's criminal history.  Once those OV and PRV scores are determined, there are a series of grids for each of the A[3] through H classification levels.  The judge uses the OV and PRV scores to determine where the defendant falls on the appropriate grid, and the cell at the intersection of the defendant's OV and PRV levels recommends a range of minimum sentences.  That range of sentences is supplemented by the defendant's status as a habitual offender, if applicable.  MCL 777.21(3).  A court may sentence a defendant to a minimum sentence outside of the recommended range, but as noted, the minimum sentence imposed still cannot be more than $^2/_3$ of the statutory maximum, MCL 769.34(2)(b).

When the sentencing guidelines are applied to defendant, they call for a very different sentence than the choice of either "1 day to life" or a 15-year maximum.

---

[2] The exceptions almost all appear to move downward—making what would otherwise be a higher-classification offense based on its statutory maximum a lower classification instead.  Perhaps the only contrary exception is CSC-III, which is punishable by a maximum of 15 years in prison (thus appearing to be a Class C felony), but has been made a Class B felony.  See MCL 777.16y.

[3] There is also a special "M2" class for second-degree murder, MCL 777.16p, which is also a "life or any term of years" offense, MCL 750.317, but it gets its own grid with amplified minimum sentences, MCL 777.61.

Defendant's indecent-exposure offense is on the master list of "included felonies" and is listed as a Class A offense with a "Stat Max" (statutory maximum sentence) of "Life." MCL 777.16q. The trial court assessed defendant 45 OV points and 140 PRV points. These scores put him in cell F-III on the Class A grid, which corresponded with a recommended minimum sentence of between 135 and 225 months. MCL 777.62. Because defendant is a fourth-offense habitual offender, the high end of that range was doubled, MCL 777.21(3)(c), meaning the guidelines recommended that the trial court give defendant a minimum sentence of between 135 and 450 months. The trial court sentenced defendant consistently with the recommended range to a minimum of 300 months in prison—a 25-year *minimum* rather than a 15-year *maximum*. Indeed, even the lowest minimum sentence in cell F-III on the Class A grid (135 months) is longer than the maximum minimum sentence that would otherwise be allowed if defendant's offense were treated as a two-year felony with the maximum enhancement for a fourth-offense habitual offender (120 months, or $^2/_3$ of 180 months).

The most likely cause of these radically disparate outcomes is that in the 46 years between the "1 day to life" system being enacted in 1952 and the Legislature's adoption of the guidelines in 1998, its institutional memory simply failed. It saw the language "1 day to life" in MCL 750.335a, concluded that it meant the equivalent of "life or any term of years"—i.e., that any sentence was viable, up to and including "life"—and thus listed "indecent exposure by a sexually delinquent person" as a Class A felony with a statutory maximum of "Life." This was a forgivable mistake; the "1 day to life" scheme is an unusual one, while "life or any term of years" is the routinely stated punishment in our

criminal laws for the most serious crimes.[4]  Nevertheless, it *was* a mistake—MCL 767.61a describes "1 day to life" as an "alternate sentence," and decades ago we noted that "the Legislature introduced language into several *previously existing categories of sexual offenses* to allow prosecution for sexual delinquency."  *People v Winford*, 404 Mich 400, 406; 273 NW2d 54 (1978) (emphasis added).  The "sexually delinquent person" system did not create any new crimes; rather, it added an alternative punishment for certain preexisting crimes.  When the Legislature listed "[i]ndecent exposure by a sexually delinquent person" in MCL 777.16q, it erroneously listed an offense which, on a proper reading of MCL 750.335a, did not exist as a distinct crime.

The issue then becomes how we are to react to this failure of the Legislature's institutional memory.  The lynchpin of the majority's analysis, it appears to me, is that the "ordinary meaning" of MCL 777.16q is that it does not mean what it says, and therefore, the Legislature did not intend to say what it said.  The majority asserts:

> The only possible textual basis for the term-of-years sentence [defendant received] is a reference in § 16q to "Life" as the "Stat Max" . . . for convictions under § 335a(2)(c).  Nothing in the text indicates that the term "Life" in § 16q can encompass any term of years . . . .  One would have to interpret "Life" to mean "life *or* any term of years." . . .  At best, the reader would need to work through a series of inferences in order to conclude that "Life" could also mean "any term of years": (1) the guidelines grid provides for a minimum term-of-years sentence for convictions under § 335a(2)(c); (2) but life tails (i.e., sentences of a minimum number of years with a maximum of life) are prohibited by MCL 769.9(2); (3) therefore, a defendant may not be sentenced to a minimum term of years with a maximum

---

[4] Examples abound and include second-degree murder, MCL 750.317, and armed robbery, MCL 750.529(2).  Some use equivalent variations, such as in the case of assault with intent to murder, where the punishment is "life or any number of years."  MCL 750.83.  The *very most* serious crime is first-degree murder, which has a mandatory sentence of life without the possibility of parole.  MCL 750.316(1).

6

of life; (4) it would then follow that the maximum must be "life *or* any term of years."

The problem, in my view, is that this "series of inferences" is commonplace throughout the sentencing guidelines. As a general matter, Class A felonies are the "life or any term of years" offenses.[5] When reviewing the guidelines' list of included felonies, it does not call for much of an interpretive leap "to interpret 'Life' to mean 'life *or* any term of years,' " seeing as this is what "Life" in the "Stat Max" column *does* mean throughout the guidelines' list of included felonies. The majority suggests that "Life" in the "Stat Max" column has a range of meanings, but this is not so—absent these "1 day to life" sexual delinquency offenses and one objective error,[6] *every* offense with a "Stat Max" of "Life" is a "life or any term of years" offense. And the intention to treat listed Class A felonies with a "Stat Max" of "Life" as "life or any term of years" crimes is clearly communicated by the recommended minimum sentences on the Class A grid; as noted, the recommended sentences there cannot be reconciled with a 2- or even a 15-year maximum sentence.[7] "Life" as the "Stat Max" is used throughout the guidelines as shorthand for offenses whose maximum sentence is "life or any term of years."

---

[5] Class A also includes some offenses which are not life offenses but have maximum punishments greater than 20 years. See, e.g., MCL 777.13m (listing as Class A offenses certain controlled substance offenses with maximum punishments of 25 and 30 years).

[6] Using an explosive to facilitate a burglary is a crime with a 15-year minimum and 30-year maximum, MCL 750.112, but its "Stat Max" is listed as "Life," MCL 777.16f. Here, there is no possible argument that the adoption of the sentencing guidelines has indirectly changed the meaning of existing text in MCL 750.112—"30 years" and "life" simply cannot be reconciled in the way that "life" and "1 day to life" could be.

[7] There is one "life or any term of years" offense listed as a Class B felony: perjury committed under MCL 767A.9(1)(b). See MCL 777.17f.

If we were to accept that the Legislature meant what it said when it adopted MCL 777.16q, the next question would be whether MCL 777.16q can be reconciled with MCL 750.335a. Arguably, it can. The "1 day to life" phrasing the Legislature used in 1952 is malleable and susceptible to multiple meanings. It is not ungrammatical to read "1 day to life" as encompassing all possible carceral sentences, including the 25- to 70-year sentence defendant is serving, inasmuch as 25 years and 70 years both fall within a *range* of at least 1 day and at most the remainder of the defendant's natural life. When this case was last here, we held that this was not the *correct* reading of that language at the time it was enacted in 1952 because "1 day to life" is a nonmodifiable sentence. But the question then becomes, when MCL 777.16q listed defendant's offense as a distinct felony to be sentenced on the Class A grid, did that have the effect of changing the meaning of "1 day to life" in MCL 750.335a? After all, "the legislative power of the State of Michigan is vested in a senate and a house of representatives." Const 1963, art 4, § 1. When the state legislates, it changes the law. Under some circumstances, "the most recent expression of this state's public policy" controls. *Citizens Ins Co of America v Federated Mut Ins Co*, 448 Mich 225, 232; 531 NW2d 138 (1995). Why not here? As the Court of Appeals noted, when aggravated indecent exposure was added to MCL 750.335a, it was tie-barred to a bill adding an entry for aggravated indecent exposure to MCL 777.16q which maintained "indecent exposure by a sexually delinquent person" as an independent offense. *People v Arnold (On Remand)*, 328 Mich App 592, 604-606; 939 NW2d 690 (2019). This may have been the Legislature misinterpreting its own work from 1952, but by re-emphasizing that misinterpretation, can the Legislature have changed the meaning of "1 day to life" to make it the equivalent of "life or any term of years"?

8

Given that I am concurring in the result reached by the Court, obviously my answer to this question is "no." We are required to negate this expression of legislative intent because Michigan constitutional law prevents the adoption of a provision of the Code of Criminal Procedure (i.e., MCL 777.16q) from indirectly amending a provision of the Michigan Penal Code (i.e., MCL 750.335a(2)(c)) in this manner. Since the ratification of the Michigan Constitution of 1850, statutory reform in Michigan has been boxed in by two related constraints. First, public acts must not "embrace more than one object," which must be expressed in an official title to the statute. Const 1963, art 4, § 24.[8] Second, once a statute is enacted, it cannot "be revised, altered or amended by reference to its title only"; to make changes, "[t]he section or sections of the act altered or amended shall be re-enacted and published at length." Const 1963, art 4, § 25.[9] These are respectively known as the "Title-Object" and "Reenact-Publish" clauses of the Michigan Constitution. See *Midland Twp v State Boundary Comm*, 401 Mich 641, 651, 657; 259 NW2d 326 (1977). The combination of the Title-Object and Reenact-Publish clauses forces the Legislature to organize our law into subject-specific "silos." These silos can be quite broad, such as the Michigan Penal Code, 1931 PA 328, and the Code of Criminal Procedure, 1927 PA 175; or they can be narrow, such as the silo governing work release for inmates in county jails, 1962 PA 60. However, once so organized, changes to the material in each silo must come

---

[8] See also Const 1850, art 4, § 20; Const 1908, art 5, § 21.

[9] See also Const 1850, art 4, § 25; Const 1908, art 5, § 21. Although they were five sections apart in the Constitution of 1850, the Constitutional Convention of 1908 recognized the close relationship between them and essentially ratified our post-1850 caselaw by reorganizing both into the same section. In our current Constitution, they are similarly separate but consecutive sections.

9

in the form of what we might call "redline edits" to that material. A violation of the Reenact-Publish Clause is generally known as an "amendment by reference." See *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441, 475; 208 NW2d 469 (1973).

To understand how we have arrived at this rule, we must understand how the Reenact-Publish Clause made it into our Constitution. By its terms, it prohibits statutory enactments in the federal style formerly used in Michigan. Here is an example:

> Section 1. *Be it enacted by the Senate and House of Representatives of the State of Michigan*, That section one of an act entitled "an act to incorporate the Detroit and Howell Plank Road Company," approved April 3, 1848, be and the same is hereby amended, by inserting after the word "from," in the eleventh line of said section, the following words: "the west line of Woodward Avenue in;" and also by inserting after the word "Oakland," in the seventeenth line of said section, the words, "*Provided*, No toll gate shall be placed within the limits of said city." [1850 PA 321.]

"Such an amendment requires an examination and comparison of the prior act to understand what change was effected." 1A Singer & Singer, Sutherland Statutory Construction (7th ed), § 22:16, p 304. Thus, in this example, the reader could not tell what the state of the law was without consulting the 1848 Public Acts. "Such an enactment is properly termed a 'blind' amendment." *Id*.[10] The Reenact-Publish Clause requires, instead of a description of what words are being stricken or inserted, that the finished product be published and presented to the public. "Most courts apply the constitutional provision only to those acts which are amendatory in form," *id*. § 22:18, p 308, meaning that in most states,

_____

[10] Provisions banning this practice in state constitutions are common. "Only the Federal Congress and the Iowa legislature still employ 'blind' amendments." Sutherland, § 22:16, p 304 n 21.

10

the reenact-publish requirement goes no further than prohibiting the form of "blind" amendments.

Michigan and a few other states have interpreted their reenact-publish clauses to go one step beyond banning the *form* of blind amendments to require that a statute that amends some existing law in *substance* must be enacted as a redline edit to that law. See *id.* ("[I]n a minority of jurisdictions, acts not purporting to amend have been held amendatory because in substance they altered or modified a prior act and were not complete within themselves.").[11] "The purpose of art 4, § 25 is to give notice and certainty. Obviously, if reference to the title only is not enough for notice and certainty, giving no reference at all is *a fortiori* not enough." *Advisory Opinion re 1972 PA 294*, 389 Mich at 518 (opinion by WILLIAMS, J.). If it is a problem for the Legislature to acknowledge some earlier law and only *describe* the changes being made to that law—without displaying the finished work product—it is even worse for the Legislature to deliberately *ignore* the existence of prior law and pass some new enactment that contradicts it.

> Even though an act professes to be an independent act and does not purport to amend any prior act, still if, in fact, it makes changes in an existing act by adding new provisions and mingling the new with the old on the same

---

[11] The constitutional language does not require that actual redline be *published* by presenting stricken language in strikethrough text and the added language in boldface; instead, what is required is that the finished, post-amended text be published. As a result, "[t]he constitutional prohibition against blind amendments may not have achieved its objective" because "[t]he change of a single word buried in a long and cumbersome section may be as effectively shielded from legislative and public scrutiny as it would be by blind amendment." Sutherland, § 22:16, pp 304-305. When I refer to "redline edits," I refer to the requirement in our caselaw that generally requires that the Legislature, to change the meaning of statutory text, must edit the text to be changed rather than enact some other inconsistent provision.

11

subject so as to make of the old and the new a connected piece of legislation covering the same subject, the latter act must be considered as an amendment of the former and as within the constitutional prohibition. [*People v Stimer*, 248 Mich 272, 293; 226 NW 899 (1929) (POTTER, J., dissenting) (quotation marks and citation omitted).][12]

As a result, once the law is in a particular form, changes to it must be redline edits to the existing law.

Of course, in some sense any new law has an effect on all existing law. If republication of redline-edited statutory text were required when any arguable change to existing law were being effected by a new law, vast swathes of the law would need to be republished every time any new law was adopted. We recognized this long ago:

> If, whenever a new statute is passed, it is necessary that all prior statutes, modified by it by implication should be re-enacted and published at length as modified, then a large portion of the whole code of laws of the State would require to be republished at every session, and parts of it several times over, until, from mere immensity of material, it would be impossible to tell what the law was. [*People ex rel Drake v Mahaney*, 13 Mich 481, 496-497 (1865).]

As a result, we have articulated an important exception to the requirement that changes to existing law come in the form of a redline edit: such edits are not required when a change comes in the form of a new law that is "complete in itself."

> This constitutional provision must receive a reasonable construction, with a view to give it effect. The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws. An amendatory act which purported only to insert certain words, or to substitute one phrase

---

[12] In *Alan v Wayne Co*, 388 Mich 210, 277; 200 NW2d 628 (1972), we said that the majority opinion in *Stimer* "seems to be another case where hard facts (public health and safety) make bad law" and expressed agreement with Justice POTTER's dissent.

12

for another in an act or section which was only referred to but not re-published, was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in that form for that express purpose. Endless confusion was thus introduced into the law, and the constitution wisely prohibited such legislation. But an act complete in itself is not within the mischief designed to be remedied by this provision, and cannot be held to be prohibited by it without violating its plain intent. [*Id.* at 497.]

This then raises the question: what is "an act complete in itself"? Generally speaking, "[a] statute is complete within itself when it is not necessary to refer to any other statute to understand its scope and meaning." Sutherland, § 22:21, p 316.

> The character of an act, whether amendatory or complete in itself, is to be determined not by its title, alone, nor by the question whether it professes to be an amendment of existing laws, but by comparison of its provisions with prior laws left in force, and if it is complete on the subject with which it deals it will not be subject to the constitutional objection, but if it attempts to amend the old law by intermingling new and different provisions with the old ones or by adding new provisions, the law on that subject must be regarded as amendatory of the old law and the law amended must be inserted at length in the new act. [*Stimer*, 248 Mich at 293 (POTTER, J., dissenting) (quotation marks and citation omitted).]

There is thus an undeniable "know it when you see it" quality to the "act complete in itself" requirement. "Arguably, no act is an 'island entire of itself.' Every act draws on some other act or acts—perhaps an appropriation act or the Revised Judicature Act or an act establishing a unit of government. 'Completeness', then, is necessarily a flexible concept." *Advisory Opinion re 1972 PA 294*, 389 Mich at 495-496 (LEVIN, J., concurring). "Statutes to which this phrase has been applied differ greatly in the extent to which reference to prior statutes is necessary," and "courts in different jurisdictions have reached inconsistent results." Sutherland, § 22:21, pp 317, 318. We must look to our own cases to understand how this Court has understood the notion of an act being "complete in itself."

13

Our seminal case on this topic is *Mahaney*. In that case, the Legislature had enacted a city charter for Detroit, 1857 PA 55, and had adopted certain amendments to that charter thereafter, 1861 PA 136. Later yet, it adopted a law providing for a "police government" for the city. 1865 PA 78. In doing so, the 1865 law "modifie[d] the powers and duties of sheriffs, constables, water and sewer commissioners, marshals, mayors and justices, and impose[d] new duties upon the executive and the citizen," *Mahaney*, 13 Mich at 497, and thus made implicit changes to the statement of those powers and duties from the 1861 law. The 1865 law was alleged to violate the Reenact-Publish Clause. We upheld the 1865 law, but our rationale in doing so was *not* that the constitutional language went no further than prohibiting the form of blind amendments. Rather, we said that the 1865 law was constitutional because it was an "act complete in itself"—it told the reader everything the reader needed to know to implement its single object, and while it incidentally affected other laws, they were reconciled via the normal process of statutory interpretation. *Id*. Or, as we put it when the no-fault law was challenged as violating the Reenact-Publish Clause, "It is a complete act and does not confuse or mislead, but publishes in one act for all the world to see what it purports to do." *Advisory Opinion re 1972 PA 294*, 389 Mich at 476.

An example of a case involving a statute that was *not* "complete in itself"—and thus violated the Reenact-Publish Clause—is *Mok v Detroit Bldg & Savings Ass'n No. 4*, 30 Mich 511 (1875). In *Mok*, the Legislature had adopted a law "to authorize the formation of corporations for mining, smelting or manufacturing iron, copper, mineral coal, silver or other ores or minerals . . . ." 1853 PA 41, title. It then passed a law "to authorize the formation of corporations for building and leasing houses and other tenements," 1855 PA 133, title, but this act was only a single paragraph and provided that the 1853 rules for the

14

organization of mining corporations were extended to corporations for leasing houses. Later yet, the Legislature passed a law "to authorize the incorporation of building and savings' associations," 1869 PA 152, title, which incorporated by reference the 1855 requirements for corporations for leasing houses (and which, in turn, incorporated by reference the 1853 law for mining corporations). The 1869 law thus "referred parties in this circuitous manner to . . . [the 1853 law] for the requirements in organization," but it also "undertook at the same time to dispense with some things required by [the 1853 law], and to make some changes" suitable for the type of corporate entity the 1869 law contemplated creating. *Mok*, 30 Mich at 521. The result was that

> [t]he act of 1853 has been, for the purposes of building and savings associations, incorporated in and made a part of the act of 1869, but with several changes and modifications, and these not made by the re-enactment of the sections changed or modified, but only by indicating the extent of the changes, leaving the parties concerned to fit the new act to the old as best they may. It is unfortunate for those who have had occasion to attempt it, that this case illustrates so forcibly the evils of this species of legislation; for on many points it is impossible, in seeking for the legislative intent, to get beyond the regions of pure conjecture. [*Id*. at 523.]

We held the 1869 law unconstitutional. "While the act of 1853 [was] left untouched as to the organizations contemplated by its provisions, it is, for the purposes of building and savings associations, altered in most important particulars in disregard of the constitutional requirement." *Id*. at 529.

> What has been attempted here is, to duplicate an act, but at the same time to accommodate it by indirect amendments to a new class of cases, in disregard of the constitutional provision which requires each act of legislation to be complete in itself, and forbids the enactment of fragments which are incapable of having effect or of being understood until fitted in to other acts after by construction or otherwise places have been made for them. No such legislation can be sustained. [*Id*.]

15

Cases in which a statute survives a constitutional challenge (as in *Mahaney*), and cases in which a statute is held unconstitutional (as in *Mok*), do not exhaust the possibilities under our caselaw concerning the Reenact-Publish Clause. "The *Mahaney* and *Mok* cases . . . mark two outer boundaries. Between the two, further lines can be drawn." *Advisory Opinion re 1972 PA 294*, 389 Mich at 496 (LEVIN, J., concurring) (citation omitted). In *Alan v Wayne Co*, 388 Mich 210; 200 NW2d 628 (1972), we said that one statute could have an unconstitutional *effect* on another, even if both statutes were themselves constitutional. The facts of *Alan* were convoluted, but the dispute concerned whether Wayne County could, via a shell game, pledge its full faith and credit to guarantee payment on bonds that would finance construction of a replacement for Tiger Stadium. To build the stadium, Wayne County had established a "Stadium Authority" under the building authority act, 1948 (1st Ex Sess) PA 31. The plan was that the Authority would issue bonds to pay for the stadium and then lease the new stadium to Wayne County, whose "lease payments" would cover the costs of the bond payments. However, the Authority would also *sublease* the stadium to the Tigers, and these payments, from the Tigers to the Authority, would cover the Authority's bond obligations; the lease to and payments from the county were only a backstop to ensure the bondholders were paid in the event that revenue from the Tigers was inadequate.

The fundamental inquiry in *Alan* was whether the Authority was issuing *revenue* bonds—which are paid for by revenues generated by the improvement they finance—or *tax* bonds, which are guaranteed by the full faith and credit of the government to pay its obligations as backed by its authority to impose taxes to generate sufficient revenue. The Authority pointed to the Revenue Bond Act (RBA), 1933 PA 94, and the aforementioned

16

building authority act as sources of its power to issue bonds, but both statutes only allowed it to issue *revenue* bonds. If the bonds that it contemplated selling were going to be backed by the county's full faith and credit, that would be a *tax* bond that the Authority did not have the power to issue, which would scuttle the project. And the ultimate guarantee that the bond payments would be made in the event that the sublease to the team was inadequate were the county's lease payments to the Authority. The Authority therefore needed the county's lease payments to be construed as a form of revenue derived from the use of the stadium and not as a simple promise from the county to use its taxing authority to generate sufficient funds if the Authority was going to have the power to issue the bonds.

We first analyzed the lawfulness of the arrangement under the RBA. As its name implies, bonds issued under the RBA must be revenue bonds—they can be satisfied "solely from the net revenues derived from the operation of the public improvement." MCL 141.107(2). The RBA therefore does not allow the government's full faith and credit to be pledged to pay off bonds issued under it; only revenues derived from the operation of the public improvement can be so used. We held that the true user of the stadium was the Tigers, not the county, and therefore the county's promise of nominal "lease" payments to the Authority did not satisfy MCL 141.107(2) as " 'net revenues derived from the operation of the public improvement.' " *Alan*, 388 Mich at 247-248. Because the county's "lease" payments to the Authority did not qualify as revenue derived from the use of the stadium— since the county was not, in any realistic sense, the user of the stadium—the RBA did not authorize the Authority to issue bonds that were backed by those "lease" payments.

The Authority argued that even if the RBA did not authorize the bonds at issue, the building authority act did. The building authority act authorized the Authority to " 'issue

17

self-liquidating revenue bonds in accordance with' " the RBA, and as with the RBA, " '[s]uch bonds" were to be " 'payable solely from the revenues of such property.' " *Alan*, 388 Mich at 253-254. The building authority act thus incorporated the RBA by reference, but there was an important proviso: under the building authority act, the phrase " 'revenues of such property' " was to " 'be deemed to include payments made under any lease or contract for the use of such property.' " *Id*. We had already held that the county's lease payments did not qualify as "revenue" under the RBA because the county was not the true user of the stadium. But when dealing with a bond issued under the building authority act, the statute decreed that such payments were to "be deemed" a form of revenue. In other words, the Authority argued that even if the county's "lease payments" could not be treated as revenue that supported the bonds *under the RBA*, those same "lease payments" could be treated as revenue that supported the bonds *under the building authority act*.

In *Alan*, 388 Mich at 236, we rejected "[t]his effort to treat tax bonds as revenue bonds," recognizing it for the shell game it was. We concluded that *any* bonds supported by the county's "lease" payments to the Authority were, in effect, *tax* bonds—the county's full faith and credit was behind them. Further, we said that the building authority act incorporated the RBA by reference, meaning it only allowed for bonds that complied with the RBA. *Id*. at 265-266. For the building authority act to indirectly give tax bonds the blessing of the RBA was an unconstitutional amendment by reference of the RBA. What is notable about *Alan* is this: while it held that the challenged section of the building authority act was an amendment by reference of various sections of the RBA in violation of the Reenact-Publish Clause, it did not hold that the building authority act *itself* was

18

unconstitutional. It was the building authority act's *effect* on the RBA that was objectionable.

In my view, our caselaw establishes that the Reenact-Publish Clause exists *precisely* to prevent the sort of confusion that exists in this case. Statutes may have only a single purpose, which groups our laws into "silos" whose contents are related; and, once our law has been organized into those silos, adjustments must be made by redline edit, unless the adjustment is in the form of an act "complete in itself" that thoroughly treats the subject in some new way—building some new silo. That is not what we have here. In this case, we are dealing with two silos established by the Legislature: the Michigan Penal Code and the Code of Criminal Procedure. As required by the Title-Object Clause, the single object of the Michigan Penal Code is defining crime—as it says in its title, it is an act "to define crimes and prescribe the penalties and remedies . . . ." 1931 PA 328, title. The single object of the Code of Criminal Procedure is to establish the processes by which criminal cases are to be handled, one aspect of which is pronouncing sentence; as it says in its title, it is an act "to provide for judgments and sentences of persons convicted of criminal offenses and ordinance violations . . . ."[13] 1927 PA 175, title. The Legislature placed the

---

[13] The majority notes that MCL 777.16q is found in the Code of Criminal Procedure and points to this as a "strong indication that the guidelines did not smuggle a substantive penalty provision" into our law. By casting this as a mere matter of statutory interpretation, however, the majority obscures what I believe is a *necessary* recourse to the state Constitution to nullify what the Legislature has enacted. Both the Title-Object and Reenact-Publish requirements are more than mere guides to reading statutory text; they are mandatory constitutional requirements. Given the close relationship between the concepts, however, it seems that defendant here could also have framed his challenge to his sentence as a violation of the Title-Object Clause rather than an unconstitutional amendment by reference.

19

definition of indecent exposure in the Michigan Penal Code and provided punishments for it, including the unmodifiable "1 day to life" sentencing option. The silos having been constructed, the Legislature could only make changes within each one by amending the contents of *that* silo. As a result, the instructions in the Code of Criminal Procedure for how to sentence someone convicted of this offense cannot indirectly change what the sentencing options are as provided by the Michigan Penal Code. To the extent that they do so, that would be an unconstitutional *effect* of the Code of Criminal Procedure on the Michigan Penal Code—just as in *Alan*.

While the boundaries of our "amendment by reference" caselaw are not defined with precision, I believe this situation is clearly the sort of lawmaking our doctrine prohibits. I therefore find this constitutional objection to the effect of MCL 777.16q on the meaning of MCL 750.335a a more compelling rationale for negating the expressed intent of the Legislature than the majority's explanation. It also has the benefit of being the issue briefed by the parties and on which we granted leave. That said, we both come to the same conclusion: if defendant is to be incarcerated, he must be given either an ordinary term-of-years sentence that complies with MCL 750.335a(2)(b) (as potentially modified by a habitual-offender enhancement), or a 1-day-to-life sentence under MCL 750.335a(2)(c). The sentence he actually received complies with neither of these options, so I concur with the judgment vacating his sentence and remanding for resentencing to one or the other of these options at the trial court's discretion.

Elizabeth T. Clement
Bridget M. McCormack
Megan K. Cavanagh

20